UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATHLEEN GALLIGAN, *et al.*,

      Plaintiffs,

v.

DETROIT FREE PRESS, *et al.*,

      Defendants.

Case No. 17-cv-13349
Hon. Matthew F. Leitman

_____/

**OPINION AND ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 59) AND (2) DENYING DEFENDANTS' MOTION TO SUPPLEMENT THE SUMMARY JUDGMENT RECORD (ECF No. 72)**

The Plaintiffs in this action, Kathleen Galligan, Regina H. Boone, Susan Mickels, and Ann Zaniewski, all work or worked for Defendant Detroit Free Press as photographers or reporters. They allege that the Free Press and Defendant Gannett Co., Inc. violated the federal Equal Pay Act of 1963, 29 U.S.C. § 206(d) (the "EPA") and the Michigan Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2201 *et seq.* (the "ELCRA") by paying them less than "similarly situated male colleagues on the basis of their gender, female, even though [they] performed similar duties requiring the same skill, effort, and responsibility of male counterparts." (Am. Compl. ¶ 118, ECF No. 9, PageID.84; *see also id.* ¶ 129, PageID.86.) Defendants moved for summary judgment on March 31, 2019. (*See* Mot. for Summ. J., ECF No. 59.) For the reasons explained below, the Court **GRANTS IN PART** and **DENIES**

**IN PART** Defendants' motion. The Court will permit the claims of the photographer-plaintiffs to proceed but will enter judgment in favor of the Free Press on the claims by the reporter-plaintiffs.

## I

## A

The photographer-plaintiffs in this action are Kathleen Galligan and Regina Boone. Galligan has worked as a full-time photographer for the Free Press since 2002. (*See* Am. Compl. ¶ 24, ECF No. 9, PageID.68; Galligan Dep. at 190:5–17, ECF No. 64-6, PageID.3452.) The Free Press hired Galligan as a third-year photographer at a starting salary of approximately $41,070 per year. (*See* Defs.' Resps. to Pls.' Interrogs., ECF No. 59-2, PageID.893; Galligan Personnel File, ECF No. 59-18, PageID.2905; Galligan Offer Letter, ECF No. 64-7.) Galligan took an unpaid leave from the Free Press in 2008 and 2009 to complete a fellowship. (*See* Mot. for Summ. J., ECF No. 59, PageID.781.) After her fellowship, Galligan returned to the Free Press at her prior salary. (*See id.*) At all relevant times, Galligan was a member of the Newspaper Guild of Detroit (the "Guild").

Galligan received contractually scheduled salary increases throughout her career at the Free Press. (*See* Defs.' Resps. to Pls.' Interrogs., ECF No. 59-2, PageID.893–895.) She also received merit-based salary increases once she became eligible for them in 2005. (*See* Pls.' Histories, ECF No. 64-9, PageID.3597; Defs.'

Resps. to Pls.' Interrogs., ECF No. 59-2, PageID.894–895.)  Galligan's current salary is approximately $52,572 per year. (*See* Resp., ECF No. 64, PageID.3026; Pay Chart, ECF No. 59-18, PageID.2808.)

Boone began working as a full-time photographer for the Free Press in 2003. (*See* Defs.' Resps. to Pls.' Interrogs., ECF No. 59-2, PageID.912.)  Boone is also a member of the Guild. (*See id.*)  The Free Press hired Boone as a second-year photographer at a starting salary of approximately $35,935 per year. (*See id.*)  Boone received contractually scheduled salary increases and merit pay increases throughout her career at the Free Press. (*See id.* at PageID.912–914; Pay Chart, ECF No. 59-18, PageID.2808.)  Boone accepted a voluntary buyout from the Free Press in December 2016. (*See* Defs.' Resps. to Pls.' Interrogs., ECF No. 59-2, PageID.914.)  At the time, Boone's salary was approximately $50,563 per year. (*See* Pay Chart, ECF No. 59-18, PageID.2808.)

Galligan and Boone have identified three male photographers who worked at the Free Press at the same time as them and who were paid more than them: Romain Blanquart, Kirthmon Dozier, and Andre Jackson. (*See* Resp., ECF No. 64, PageID.3031–3033.)

**B**

Ann Zaniewski and Susan Mickels are the reporter-plaintiffs in this action. The Free Press hired Zaniewski in 2012 as a general assignment reporter at a starting

salary of $52,000. (*See* Defs.' Resps. to Pls.' Interrogs., ECF No. 59-2, PageID.853; Zaniewski Offer Letter, ECF No. 59-18, PageID.2804.) Zaniewski received contractually scheduled salary increases throughout her time at the Free Press. (*See* Defs.' Resps. to Pls.' Interrogs., ECF No. 59-2, PageID.853.) In 2014, the Free Press assigned Zaniewski to the Detroit education beat.[1] (*See id.*) Zaniewski received a 5% pay increase when she moved to that beat. (*See id.*; former Free Press Managing Editor Julie Topping Decl. ¶ 19, ECF No. 59-17, PageID.2702.) In 2017, the Free Press merged Zaniewski's Detroit education beat with the K–12 education beat into a single beat. (*See* Defs.' Resps. to Pls.' Interrogs., ECF No. 59-2, PageID.854.) A different reporter was assigned to the newly created beat. (*See id.*) Zaniewski was reassigned – at her same salary – to the Freep Now team. (*See id.*) Reporters on the Freep Now team cover breaking news. (*See* Free Press editor Steve Pepple Dep. at 157:5–11, ECF No. 64-3, PageID.3191.) In November 2017, Zaniewski met with new Free Press Executive Editor Peter Bhatia to request a pay increase, and Bhatia approved a 5% salary increase for her. (*See* Defs.' Resps. to Pls.' Interrogs., ECF

---

[1] Defendants refer to this beat as the "Detroit Public Schools" beat. (*See* Defs.' Resps. to Pls.' Interrogs., ECF No. 59-2, PageID.853.) Zaniewski, however, refers to this beat as the "Detroit education beat" because "[i]t wasn't just Detroit Public Schools." (Zaniewski Dep. at 37:19–20, ECF No. 64-21, PageID.4119.) For the purposes of this Opinion and Order, the Court adopts Zaniewski's description of her beat.

No. 59-2, PageID.854.)  As of 2018, Zaniewski's salary is approximately $61,484 per year. (*See* Pay Chart, ECF No. 59-18, PageID.2807.)

Mickels began her career at the Free Press in 1984 when she was hired as a solicitor for the paper's advertising department. (*See* Defs.' Resps. to Pls.' Interrogs., ECF No. 59-2, PageID.813.)  In 1995, Mickels moved to an editorial research assistant position. (*See id.* at PageID.814.)  In December 2010, the Free Press promoted Mickels to a reporter position at a yearly salary of approximately $48,125.[2] (*See id.* at PageID.814–815; Mickels Personnel File, ECF No. 59-18, PageID.2802.)

Mickels initially "reported on all things food." (Mickels Dep. at 119:24, ECF No. 64-15, PageID.3962.)  According to Mickels, "I wr[o]te restaurant news stories. . . . I wr[o]te about food as a business from . . . following the trends in . . . the grocery industry.  So I ke[pt] track of everything that's happening in . . . the state of the grocery industry." (*Id.* at 127:13–15, 129:18–22, PageID.3964–3965; Pls.' Histories, ECF No. 64-9, PageID.3602–3604.)  In addition, "a very small part" of Mickels' job involved testing and shopping for recipes that she would write about for the Free Press. (Mickels Dep. at 120:2–122:10, ECF No. 64-15, PageID.3962–3963.)  Mickels therefore worked in both a test kitchen and the Free Press newsroom while she reported on her food beat. (*See id.* at 153:8–12, PageID.3971.)  Mickels

_____

[2] Susan Mickels writes under the name "Susan Selasky."  Documents in the record therefore occasionally refer to Mickels as "Susan Selasky." (*See, e.g.*, 2018 Mickels Performance Evaluation, ECF No. 64-17, PageID.4054.)

has since been reassigned to the "248 Woodward" beat, where she covers restaurant, retail, and real estate news. (*See* Resp., ECF No. 64, PageID.3028.) As of 2018, Mickels' salary is approximately $52,631. (*See* Pay Chart, ECF No. 59-18, PageID.2806.)

Zaniewski and Mickels have identified three male reporters who worked at the Free Press at the same time as them and were paid more than them: David Jesse, Joseph Guillen, and Marlon Walker. (*See* Resp., ECF No. 64, PageID.3033–3036.) Mickels, but not Zaniewski, also identifies Robert Allen and Brian McCollum as male reporters who have been paid more than her during her tenure as a Free Press reporter. (*See id.* at PageID.3036–3037.)

## II

Plaintiffs filed this action on October 13, 2017. (*See* Compl., ECF No. 1.) Plaintiffs allege that Defendants discriminated against them by paying them less than their similarly situated male colleagues. (*See* Am. Compl. ¶ 118, ECF No. 9, PageID.84.) According to Plaintiffs, "Defendants violated the EPA by paying lower wages to Plaintiffs, female employees, than it paid to male employees for equal work that required equal skill, effort, and responsibility and that were/are performed under similar working conditions." (*Id.* ¶ 122, PageID.85.) Plaintiffs further allege that the pay difference "between similarly situated male employees and Plaintiffs was not due to seniority, merit, quantity or quality of production, or a factor other than sex,

but was due to gender." (*Id.* ¶ 124, PageID.85.) Plaintiffs claim that, as a result of Defendants' "willful" EPA violations, they suffered numerous injuries, including "lost earnings and earning capacity, lost career opportunities, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, mental anguish, loss of professional reputation, and loss of the ordinary pleasures of everyday life, including the right to pursue gainful employment of their choice." (*Id.* ¶¶ 125–27, PageID.85–86.) Plaintiffs also bring a similar, state law gender discrimination claim under the ELCRA. (*See id.* ¶¶ 128–37, PageID.86–87.)

On November 29, 2017, Defendants filed a Motion to Dismiss Plaintiffs' Amended Complaint. (*See* 2d Mot. to Dismiss, ECF No. 14.) The Court denied Defendants' motion on March 6, 2018. (*See* Order Denying Mot. to Dismiss, ECF No. 27.) On March 21, 2019, Defendants filed the instant Motion for Summary Judgment. (*See* Mot. for Summ. J., ECF No. 59.) The Court held a hearing on Defendants' motion on October 8, 2019.

## III

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326–27 (6th Cir. 2013) (citing Fed. R. Civ. P. 56(a)). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* (quoting *Tysinger*

*v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52. Indeed, "[c]redibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255.

## IV

### A

The Court begins with Plaintiffs' claims under the EPA. The EPA "prohibits employers from paying an employee at a rate less than that paid to an employee of the opposite sex for performing equal work." *Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006). The Sixth Circuit has articulated the following framework to assess a plaintiff's prima facie case of wage discrimination:

> In order to establish a prima facie case of wage discrimination under the EPA, plaintiffs must show that an employer pays different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S. Ct. 2223, 41 L.Ed.2d 1 (1974) (quoting 29 U.S.C. § 206(d)(1)). Jobs need not be identical in order to be considered "equal work" under the EPA. *Shultz v.*

> *Wheaton Glass Co.*, 421 F.2d 259, 265, & n.10 (3d
> Cir.), *cert. denied*, 398 U.S. 905, 90 S. Ct. 1696, 26
> L.Ed.2d 64 (1970). Whether a job is substantially equal
> for purposes of the EPA is determined on a case-by-case
> basis and "resolved by an overall comparison of the work,
> not its individual segments." *Odomes v. Nucare, Inc.*, 653
> F.2d 246, 250 (6th Cir. 1981) (orderlies and nurses aides
> perform substantially equal work).

*Id.* at 359–60.

Three additional points are relevant to a plaintiff's prima facie case of pay discrimination under the EPA. First, "the comparison at the prima facie stage is of the jobs and not the employees." *Id.* at 363. Therefore, "only the skills and qualifications actually needed to perform the job are considered," and "[f]actors like education and experience [of particular male comparators] are considered as a defense to an employer's liability rather than as part of a plaintiff's prima facie case." *Id.* Second, in order to establish that two jobs have equal responsibilities, a plaintiff must present evidence that "the *specific* job requirements and duties" of the two jobs are substantially the same. *Carey v. Foley & Lardner LLP*, 577 F. App'x 573, 579–80 (6th Cir. 2014) (quotation omitted) (emphasis added) (affirming summary judgment on EPA claim because plaintiff "presented no evidence of the specific 'job requirements and duties' of his female colleagues"); *see also Spencer v. Va. State Univ.*, 919 F.3d 199, 204 (4th Cir. 2019) (explaining that a plaintiff bringing a claim under the EPA "may not rely on broad generalizations at a high level of abstraction"). Third, a plaintiff need "only" identify "one" proper comparator to

establish a prima facie case. *EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 122 (4th Cir. 2018); *see also Woodard v. Medesek, Inc.*, 178 F. Supp. 3d 1188, 1198 n.12 (N.D. Ala. 2016) ("[E]ven a single comparator is sufficient to withstand the defendant's motion for summary judgment.").[3]

If a plaintiff establishes a prima facie case of pay discrimination, then the defendant must "'prove' that the wage differential is justified under one of the four affirmative defenses set forth under § 206(d)(1) of the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." *Beck-Wilson*, 441 F.3d at 360 (quoting *Buntin*, 134 F.3d at 799). The defendant bears the burden of proof for these affirmative defenses. *See id.* (citing *Corning Glass Works*, 417 U.S. at 197). This burden is a "heavy one." *Perkins v. Rock-Tenn. Servs., Inc.*, 700 F. App'x 452, 457 (6th Cir. 2017); *see also Md. Ins. Admin.*, 879 F.3d at 120. Indeed, a defendant is entitled to judgment as a matter of law on an EPA affirmative defense "only if the record shows that [the defendant] established the defense so clearly that no rational jury could have found to the contrary." *Buntin*, 134 F.3d at 800; *see also Vehar v. Cole Nat'l Grp., Inc.*, 251 F. App'x 993, 1000 (6th Cir. 2007) ("[I]t must be shown that the factor of sex provides absolutely no part of the basis for the pay disparity.").

---

[3] *Cf. Buntin v. Breathitt Cty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998) ("The plaintiff may meet her prima facie burden by demonstrating a wage differential between herself and her predecessor.").

**B**

The Court turns first to Defendants' motion with respect to the EPA claims of the photographer-plaintiffs: Galligan and Boone. Defendants are not entitled to summary judgment on those claims.

**1**

Galligan and Boone primarily argue that they have established a prima facie case under the EPA by showing that all Free Press photographers are "fungible" and that they were paid less than at least some male photographers. (*See* Resp., ECF No. 64, PageID.3016–3017 ("All staff photographers perform the same job."); *see also id.* at PageID.3038–3045.) Defendants respond that, as a matter of law, a plaintiff may not make a prima facie case under the EPA with a showing of "fungibility." Defendants insist that, instead, a plaintiff must compare her particular position with the position of a specific male comparator and must demonstrate that she performs the same work as that specific comparator. (*See* Reply, ECF No. 66, PageID.5343–5344.) Defendants also argue that Free Press photographers are "decidedly not fungible." (*See id.* at PageID.5346–5348.)

The Court does need not decide whether, as a matter of law, Galligan and Boone are barred from making a prima facie case by showing that Free Press photographers are fungible. That is because, as described below, Galligan and Boone have presented sufficient evidence that they performed substantially the same

work as at least one specific male comparator, that they worked under conditions that were similar to those under which the male comparator worked, and that the male comparator was paid more than them. That evidence is sufficient to establish their prima facie case.

## 2

Galligan and Boone have established their prima facie case by showing that male photographer Romain Blanquart (1) performed "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions," 29 U.S.C. § 206(d)(1), and (2) was paid more for that work.

First, Galligan and Boone have presented sufficient evidence that their jobs and Blanquart's job involved substantially the same responsibilities. Kathleen Widdis, the Free Press Photo and Video Director who manages all the paper's photographers, identified Blanquart's duties as follows: "Take pictures on assignment, do video clips, do live video, do projects, [and] do projects that are multiplatform, be it photo, video, print, digital," and "edit video [and] post to social media."[4] (Widdis Dep. at 75:10–13, 76:8–19, 80:19–23, ECF No. 64-4,

_____

[4] Defendants cannot complain that the description of Blanquart's duties above lacks sufficient specificity. The description was given by Widdis, a manager of the Free Press' photographers, in response to a direct question that asked her to identify Blanquart's duties. The Defendants cannot reasonably hold Galligan and Boone to

PageID.3233–3234.[5]) And Blanquart verified that Galligan and Boone performed the "same duties" that he performed and had "the same or very similar" responsibilities that he had. (Blanquart Aff. ¶¶ 7–9, 15, ECF No. 64-26, PageID.4566.) As Blanquart explained, "Galligan and Boone are/were expected to do the same job as I am expected to do." (*Id*. ¶ 15.) Moreover, Galligan and Boone have presented additional evidence – including, among other things, their own testimony and their performance evaluations outlining their responsibilities – that they performed essentially the same duties as Blanquart. (*See, e.g.*, Galligan Dep. at 101:24–25, 103:2–24, 118:11–23, 263:4–264:5, ECF No. 64-6, PageID.3363, 3365, 3380, 3525–3526; 2014 Galligan Performance Evaluation, ECF No. 64-8, PageID.3588–3590; Boone Dep. at 174:10–24, 199:16–19, ECF No. 64-13, PageID.3828, 3853; 2014 Boone Performance Evaluation, ECF No. 64-12, PageID.3649–3652.)

Second, Galligan and Boone presented evidence that their jobs required the same level of effort as Blanquart's. In particular, Blanquart swore that "[t]he work I do as a photographer requires the same level of effort as what is required of Galligan and Boone." (Blanquart Aff. ¶ 12, ECF No. 64-26, PageID.4566.)

---

a higher-level of duty-specificity than their own photography manager offered. The photographer-plaintiffs are entitled to rely on the description that Widdis offered.

[5] In the first two cited portions of Widdis' deposition, she identified the duties of the general photographer position at the Free Press, and in the final cited portion, she testified that Blanquart performs those duties.

Third, Galligan and Boone presented evidence that their jobs and Blanquart's job required substantially the same "skills and qualifications." *Beck-Wilson*, 441 F.3d at 363. For instance, Blanquart, Galligan, and Boone all had quite similar experience and credentials at the time they were hired into their photographer positions,[6] (*see* Blanquart Resume, ECF No. 65-8, PageID.4922; Galligan Resume, ECF No. 64-5; Boone Resume, ECF No. 64-10), and that suggests that their three positions required like skills and qualifications. In addition, Blanquart attested that he, Galligan, and Boone were all expected to be skilled at "bring[ing] back high-quality photographs and potentially some short video clips." (Blanquart Aff. ¶ 10, ECF No. 64-26, PageID.4566.) Moreover, the evidence (discussed above) that Blanquart, Galligan, and Boone were performing essentially the same duties further indicates that their three positions required equal skill levels.

Fourth, Galligan and Boone presented evidence that their jobs involved similar working conditions as Blanquart's. Blanquart attested that, "[w]hen out on

---

[6] At the time of Blanquart's hiring, he had a bachelor's degree in photojournalism and had worked for three years as a staff photographer at the Naples Daily News in Naples, Florida. (*See* Blanquart Resume, ECF No. 65-8, PageID.4922.) When the Free Press hired Boone, she was working toward a master's degree in photography, had worked for five years at the Richmond Free Press, a weekly newspaper in Richmond, Virginia, and had completed an internship in the photography department for the largest newspaper in Memphis, Tennessee. (*See* Boone Resume, ECF No. 64-10.) And the Free Press hired Galligan after she had worked as a photographer for the Dearborn Times-Herald, worked for eight years as a freelance photographer and videographer for various news services, and studied photography and design at the College for Creative Studies. (*See* Galligan Resume, ECF No. 64-5.)

assignment, I work in the same type of working environments as Galligan and Boone." (*Id.* ¶ 13, PageID.4566.)  And Galligan confirmed that, like Blanquart, she and Boone "take photographs both inside and outside" and photograph at "daytime and nighttime." (Galligan Dep. at 265:9, 265:17, ECF No. 64-6, PageID.3526.) Moreover, all three worked under Kathleen Widdis as the Free Press Photo and Video Director (*see* Widdis Dep. at 8:4–5, 9:12–20, ECF No. 64-4, PageID.3216, 3217) and Rashaun Rucker as the Free Press Deputy Director of Photography. (*See* Rucker Decl. ¶¶ 12–13, 21, ECF No. 59-16, PageID.2686, 2688.)

Based on this "overall comparison of the work" performed by Galligan, Boone, and Blanquart, *Beck-Wilson*, 441 F.3d at 359–60, a reasonable jury could find that Galligan, Boone, and Blanquart performed "equal work" under "similar conditions."  And since it is undisputed that the Free Press paid Blanquart more than Galligan and Boone (*see* Pay Chart, ECF No. 59-18, PageID.28080), Galligan and Boone have established their prima facie case.[7]

---

[7] While the Court has determined that Blanquart is an appropriate comparator, the Court has not yet determined whether the other comparators identified by Galligan and Boone are appropriate.  If Galligan and Boone wish to offer evidence at trial concerning the other comparators identified in the summary judgment response and if Defendants object that the other comparators are not appropriate, the Court will resolve that dispute in the context of a motion in limine.

Defendants attack the sufficiency of Galligan and Boone's prima facie case on several grounds. (*See* Mot. for Summ. J., ECF No. 59, PageID.787–790.)  None convince the Court that the photographer-plaintiffs have failed to establish their prima facie case.

First, Defendants argue that Galligan and Boone did not do substantially the same work as Blanquart because they performed different assignments. (*See id.* at PageID.790.)  Defendants contend that Galligan and Boone mostly worked on daily assignments, whereas Blanquart spent more of his time on special assignments. Defendants cite to the affidavit of Free Press photography supervisor Rucker.  He attests that "[Blanquart] spends less of his time on daily assignments than [Galligan] and [Boone].  I estimate that is only about 60% of his work.  For [Boone], daily assignments represented around 90-95% of her work.  [Galligan's] photography work also is about 90-95% daily assignment, if her time on photo editing is not included." (Rucker Decl. ¶ 47, ECF No. 59-16, PageID.2693.)  But Galligan and Boone presented contrary evidence that all three photographers did perform essentially the same amount of work on daily assignments.  In particular, Blanquart swore that: "90% of my duties as a photographer at the Detroit Free Press consist of fulfilling assignments from the photo desk, covering press conferences and other events such as gallery openings, taking portraits, covering news situations like fires,

accidents, and shootings, and taking photographs in the studio." (Blanquart Aff. ¶ 5, ECF No. 64-26, PageID.4566.) And Blanquart attested that he performed the same duties at Galligan and Boone. (*See id.* ¶ 9.) Blanquart's sworn statements, taken in the light most favorable to Galligan and Boone, preclude the Court from adopting Rucker's assertion that the breakdown of Blanquart's duties differed materially from the breakdown of Galligan's and Boone's duties.

Second, Defendants argue that Galligan's and Boone's photography work does not involve the same quality, complexity, or independence as Blanquart's. Defendants contend that unlike Galligan and Boone, Blanquart "was regularly assigned to long-term, enterprise pieces and devoted more time to video projects, including complex video projects which require more time performing duties related to editing, extensive planning, and greater autonomy." (Reply, ECF No. 66, PageID.5352.) In support of that assertion, Defendants highlight Rucker's sworn statement that Blanquart, unlike Galligan or Boone, "creates long-term, enterprise pieces, with a greater portion devoted to video. . . . His work is very self-directed and independent." (Rucker Decl. ¶ 46, ECF No. 59-16, PageID.2692–2693.) However, as noted above, Galligan and Boone have presented substantial evidence that they performed the same duties as Blanquart. Moreover, Galligan's and Boone's performance evaluations demonstrate that the Free Press expected both women to produce long-term enterprise pieces and video projects – the same type of

projects that Defendants argue only Blanquart was expected to produce. (*See, e.g.*, Galligan Performance Evaluations, ECF No. 64-8, PageID.3590 ("Goal #1: Balance the news organization's need for daily photo and video with longer term projects.").)

Third, Defendants argue that Galligan did not perform the same work as Blanquart because she spent at least 40% of her time from 2014 through 2018 editing photos. (*See* Mot. for Summ. J., ECF No. 59, PageID.781–782; citing Galligan Dep. 30–32, ECF No. 59-5, PageID.1531–1533.) Photography supervisor Rucker estimated that, in contrast, Blanquart spent only "about 10% of his time on the photo editing role." (Rucker Decl. ¶ 48, ECF No. 59-16, PageID.2693.) According to Rucker, photo editing "does not have the same duties and responsibilities as a photographer and is not something that all photographers do. Photo editors pick which photos should be used for the stories that are going to be published, and also check[] that the captions are complete and accurate. Photo editor duties are also performed on the publishing platform, which requires training to use." (*Id.* ¶ 27, ECF No. 59-16, PageID.2689.) But Plaintiffs have produced at least some evidence suggesting that the difference in time spent editing is not as stark as Defendants suggest. For example, Blanquart's affidavit emphasizes that he shares the same duties as Galligan, and it does not call out the difference in time spent editing photos. (*See* Blanquart Aff., ECF No. 64-26.)

In any event, given the substantial overlap in the overall work performed by Galligan and Blanquart, the one modest difference concerning percentage of time that each of them spent editing photos does not compel a finding, as a matter of law, that Galligan and Blanquart do not perform equal work. The Sixth Circuit's guidance in *Beck-Wilson* is instructive in this regard:

> The [defendant] claims that in selecting their comparators, plaintiffs have not adequately accounted for employees' duties, care-lines, departments, or years of experience in current position. The [defendant] improperly focuses upon alleged differences between employees, rather than the jobs they perform, and also overstates the plaintiffs' burden of showing a higher-paid comparator at the prima facie stage. The text of the EPA may not be brushed with such a demanding gloss as to suggest that plaintiffs' prima facie case fails because each one has not identified one specific individual who constitutes a *perfect* male comparator.

*Beck-Wilson*, 441 F.3d at 363 (emphasis in original; quotation omitted). The Court is not persuaded that the difference in Galligan and Blanquart's time spent editing photos prevents Galligan from making her prima facie case.

**4**

Defendants next argue that they are entitled to summary judgment on their affirmative defenses to the photographer-plaintiffs' claims. (*See* Mot. for Summ. J., ECF No. 59, PageID.790–793.) The Court disagrees.

First, Defendants say that the pay disparity between Galligan, Boone, and Blanquart is justified under the Free Press' merit pay system. (*See id.* at PageID.790–

791.) But Galligan and Boone have presented evidence that the Free Press' merit pay system was not "neutral," was not governed by any consistent or objective measurement of merit, and did not fairly and consistently reward true merit. For instance, Widdis, who manages all Free Press photographers, could not provide an answer when asked "what merit pay is tied to." (Widdis Dep. at 63:25–64:3, ECF No. 64-4, PageID.3230.) And testimony from past and present Free Press Executive Editors was less than clear about how merit pay raises are determined. (*See, e.g.*, former Free Press Executive Editor Paul Anger Dep. at 43:7–44:19, 171:16–172:21, ECF No. 64-23, PageID.4424, 4456; former Free Press Executive Editor Robert Huschka Dep. at 207:3–208:4, 247:3–249:24, ECF No. 65-3, PageID.4757, 4767–4768; current Free Press Executive Editor Peter Bhatia Dep. at 84:1–85:11, 96:7–9, ECF No. 65-1, PageID.4598–4599, 4601.) On this record, a rational jury could conclude that the Free Press' merit pay system is not "a neutral system of merit," but, instead, is "driven largely by an opaque, decision-making process at the administrative level, did not necessarily reflect peers' assessment of applicants' performances, and rewarded men disproportionately to women." *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 827 (6th Cir. 2000). Thus, Defendants are not entitled to summary judgment on their merit pay affirmative defense. *See id.* (reversing judgment as a matter of law in favor of defendant on merit pay affirmative defense

where plaintiff presented evidence calling into question the fair, consistent, and objective operation of defendant's merit pay system).

Second, Defendants argue that Blanquart's higher salary is explained by a pay increase that the Free Press gave him in order to persuade him to decline a competitive offer from another newspaper. According to Defendants, "[t]he difference in pay between Galligan and Boone and Blanquart can be traced to the [21.1%] competitive increase awarded to him in 2005 to prevent him from leaving for the Chicago Tribune." (Mot. for Summ. J., ECF No. 59, PageID.793.) Yet Blanquart's competitive increase does not fully account for the gap in compensation between him, Galligan, and Boone. Some portion of the pay gap is due to differences in, among other things, merit pay raises.[8] A rational jury could find that these other factors driving the pay difference were based upon gender.

---

[8] Defendants may contend that some portion of the pay difference is due to the fact that the Free Press hired Blanquart as a fourth-year photographer, whereas Galligan was hired as a third-year photographer and Boone was hired as a second-year photographer. (*See* Defs.' Resps. to Pls.' Interrogs., ECF No. 59-2, PageID.893, 906, 912.) However, Galligan and Boone may be able to show that the Free Press' decision to start them in lower positions than Blanquart was based upon gender rather than a legitimate difference in experience. In any event, even if Defendants could show that the difference in hiring position was not based on gender, that would still not entitle them to summary judgment. As noted above, at least some portion of the pay difference between Blanquart, Galligan, and Boone is based upon differences in merit raises, and, as explained above, on this record, there is reason to question whether the Free Press' merit raise system is truly neutral and fair.

In sum, a rational jury could conclude that the difference in pay between Blanquart and the photographer-plaintiffs is due, at least in part, to gender. *See Vehar*, 251 F. App'x at 1000. Therefore, Defendants are not entitled to summary judgment on their affirmative defenses to the claims by the photographer-plaintiffs.

C

The Court next turns to Defendants' motion with respect to the EPA claims of the reporter-plaintiffs: Zaniewski and Mickels. Defendants are entitled to summary judgment on those claims.

1

The reporter-plaintiffs, echoing the photographer-plaintiffs, argue that they have established a prima facie case under the EPA by showing that (1) Free Press reporters are "fungible" and (2) they were paid less than at least some male reporters. (Resp., ECF No. 64, PageID.3018, 3041–3042.) Defendants again respond that an EPA plaintiff cannot establish a prima facie case by showing alleged "fungibility" and that a plaintiff must specifically show that her duties are substantially the same as a particular male comparator. Defendants also contend that Free Press reporters are not "fungible." (*See* Reply, ECF No. 66, PageID.5343–5348.) And, again, the Court need not rule on Defendants' contention that, as a matter of law, a plaintiff may never establish a prima facie case by showing that a class of employees are fungible. The Court need not tackle that issue because the reporter-plaintiffs have

not presented sufficient evidence to support a finding that all reporter positions at the Free Press are fungible. Thus, even if a showing of fungibility may support a prima facie case under the EPA, the claims of the reporter-plaintiffs would still fail.

Plaintiffs point to five pieces of evidence to support their assertion that all Free Press reporter positions are fungible, but that evidence – even when considered collectively – is not enough to support a finding of fungibility.

First, the reporter-plaintiffs argue that the Free Press' own editors admitted that the newspaper's "[r]eporters are fungible." (Resp., ECF No. 64, PageID.3018.) In support of that assertion, the reporter-plaintiffs cite the testimony of former Free Press editor Paul Anger. (*Id.*; citing Anger Dep. at 141:7–15, ECF No. 64-23, PageID.4448.) But in the cited portion of Anger's testimony, he did not say that the reporter position is fungible. Instead, he testified as follows:

> Q. Okay. And hypothetically at least, reporters can be moved from one area of assignment to another?
> A. Yes.
> Q. Correct?
> A. Yes.
> Q. And that has happened – that has happened throughout your time within the industry, correct?
> A. Correct.

(Anger Dep. at 141:7–15, ECF No. 64-23, PageID.4448.) Moreover, other portions of Anger's testimony reflect his belief that reporter positions are not fungible. (*See id.* at 58:23–59:2, PageID.4428 ("[C]omparing all of the employees in the newsroom

with all of the other employees in the newsroom. . . . that would not be appropriate.").)

The testimony of the Free Press' other editors mirrors that of Anger. They acknowledged that all reporters must have certain core competencies and that reporters sometimes move between assignments, but they denied that all reporter positions involve the same duties. (*See, e.g.*, Bhatia Dep. at 68:5–8, ECF No. 65-1, PageID.4594 ("[T]here's not just a reporter at the Free Press. I mean, they're various – there are all kinds of different types of reporters."); Free Press editor James Hill Dep. at 108:19–20, ECF No. 64-2, PageID.3086 ("[T]here's no apples-to-apples comparisons in a newsroom because everybody is different. . . . [T]here are no just general jobs.").) Indeed, the editors clearly indicated that different reporters at the Free Press perform different duties. They testified, for example, that "breaking news" or "general assignment" reporters spend about "90 to 95 percent of their work [on] breaking news" (Bhatia Dep. at 173:5–6, ECF No. 65-1, PageID.4621); that a beat writer, unlike a breaking news reporter, spends only about "5 to 10 percent of their work" on breaking news, and instead spends more time writing enterprise pieces and reporting on a specific topic (*see id.* at 173:6–22); and that an investigator reports on more "complex," "long-form," and "deep" assignments than other reporters work on. (*See id.* at 232:7–12, PageID.4635; Huschka Dep. at 220:1, ECF No. 65-3, PageID.4760; Anger Dep. at 55:16, ECF No. 64-23, PageID.4428.)

Simply put, there is no fair reading of the Free Press editors' testimony that supports the reporter-plaintiffs' claim that all reporter positions perform the same duties and are fungible.

Second, the reporter-plaintiffs rely upon their own testimony concerning reporters' job duties to support their contention that all Free Press reporter positions are fungible. For instance, Zaniewski testified that "[a]ll reporters do the same jobs. We all interview people and research and mine sources and follow story tips and write stories." (Zaniewski Dep. at 92:17–19, ECF No. 64-21, PageID.4173.) But the reporter-plaintiffs' testimony about job duties and functions is at too high a level of generality to support a finding that all reporter positions share the same relevant duties. The testimony describes only the most basic functions performed by all reporters and fails to account for clear differences in the *specific* duties of various reporter positions that were described in detail by the Free Press' witnesses. In short, the reporter-plaintiffs' testimony describing similarities among all reporters at the highest and most general level is not sufficient to overcome the clear evidence in this record that different reporter positions at the Free Press have different duties and that all of the reporter positions are thus not fungible.[9] *See Carey*, 577 F. App'x at

---

[9] Free Press editor Steven Pepple admitted that many Free Press reporter positions may share at least some specific duties. For instance, he acknowledged that "just about every reporter is expected to write some enterprise" pieces. (Pepple Dep. at 92:11–12, ECF No. 64-3, PageID.3174.) Other Free Press editors may have similarly acknowledged that there is at least some overlap between the specific

580 (requiring a focus on the "specific" job duties of the positions that allegedly involve "equal work")[10]; *Spencer*, 919 F.3d at 204 (explaining that a plaintiff "may not rely on broad generalizations at a high level of abstraction" when attempting to demonstrate that two positions involve "equal work"); *Wheatley*, 390 F.3d at 330 (two positions do not involve "equal work" where the responsibilities of each position bear only "the most general resemblance").

Third, the reporter-plaintiffs highlight evidence that reporters frequently move between various positions and beats at the Free Press as proof that all reporter positions are fungible. (*See* Resp., ECF No. 64, PageID.3042.) But this movement between positions does not establish that the *duties* of the different positions are

---

duties of many reporters. But the fact that many reporter positions share *some* specific duties is not enough to establish that *all* positions share *substantially the same* specific duties.

[10] During the hearing before the Court, the reporter-plaintiffs cited *Carey* for the proposition that a fellow employee may be an appropriate comparator for an EPA plaintiff even if the subject matter of the fellow employee's job differs from the subject matter of the EPA plaintiff's job. In support of this contention, the reporter-plaintiffs cited the portion of *Carey* in which the Sixth Circuit said that one partner in a law firm may be an appropriate comparator for an EPA plaintiff who is also a partner in the firm even if the two partners practice in different areas of the law. *See Carey*, 577 F. App'x at 580. The Court's ruling that the reporter-plaintiffs have failed to establish a prima facie case under the EPA does not conflict with that aspect of *Carey*. The Court is not holding that other Free Press reporters are not valid comparators because they report on subjects that differ from the subjects reported on by the reporter-plaintiffs. Instead, as described in detail above, the Court holds that the reporter-plaintiffs failed to establish their prima facie case because they did not identify any male reporters with the same specific *duties*.

substantially the same; indeed, the fact that many reporters have held a number of different positions says nothing about whether the duties of the various positions overlapped. Instead, the purportedly widespread movement between positions says, at most, that all reporters have the basic *qualifications* to assume different positions at the Free Press.[11] That is not enough under the EPA. The Act does not require equal pay for jobs that have similar qualifications but different duties. *See* 29 U.S.C. § 206(d)(1) (barring pay discrimination for "equal work on jobs the performance of which requires equal skill, effort, and *responsibility*, and which are performed under similar working conditions" (emphasis added)). In sum, the movement of reporters between positions at the Free Press arguably establishes that the qualifications for the various positions are "fungible," but it does not establish that the positions themselves are fungible in all of the respects required under the EPA.

Fourth, the reporter-plaintiffs cite evidence that they personally performed certain duties in common with other reporters, and they argue that this evidence

---

[11] The reporter-plaintiffs have submitted Free Press job postings for a breaking news reporter position and a Michigan State Spartans athletics beat reporter position, and they contend that the postings provide important support for their prima facie case. (*See* Resp., ECF No. 64, PageID.3019; citing Reporter Job Descriptions, ECF No. 65-4.) But the postings show, at most, that the qualifications for the two positions overlap. (*See* Reporter Job Descriptions, ECF No. 65-4.) The postings do not detail the specific duties of the two positions. Thus, the postings do not shore up the critical component of the reporter-plaintiffs' prima facie case that is missing: a showing that their position and another position held by a man shared substantially the same specific duties.

supports the conclusion that all Free Press reporter positions are fungible. For instance, the reporter-plaintiffs emphasize that, similar to higher education beat reporter David Jesse, who was paid more than them, they were expected to and did complete enterprise stories and stories that appeared on the "1A" section. (*See* 2013 Zaniewski Performance Evaluation, ECF No. 64-20, PageID.4069 (praising Zaniewski for producing "36 1A story bylines" as well as "some solid enterprise work"); 2014 Mickels Performance Evaluation, ECF No. 64-17, PageID.4052 (praising Mickels for "land[ing] on 1A twice" in 2014); Defs.' Resps. to Pls.' Interrogs., ECF No. 59-2, PageID.816 ("[Jesse was] expected to turn out issue stories, enterprise stories, and Sunday takeout pieces on topics relevant to Free Press readers.").) But the fact that the two reporter-plaintiffs performed *some* of the same duties as *some* other reporters falls short of showing that *all* reporter positions at the Free Press involve substantially the same duties and that *all* such positions are thus fungible.

Fifth, the reporter-plaintiffs argue that a Guild report on pay disparity at the Free Press (the "Guild Report") supports a finding of fungibility. The Guild Report calculated that the Free Press' median wage for male reporters was $2.03 per hour higher than the paper's median wage for female reporters. (*See* Guild Report, ECF No. 20-2, PageID.182.) The Guild Report did not distinguish between different

types of reporters at the Free Press, and the reporter-plaintiffs contend that the Guild Report therefore confirms that all reporters are fungible:

> [T]he court must accept as true that the Guild's classification of employees by job categories [e.g. grouping all reporters into a single "reporter" category] was appropriate and accurate for purposes of grouping together employees who perform similar work, which requires similar skill, effort, and responsibility, under similar working conditions. It is plausible that the Guild accurately grouped the employees in the manner it did because, as a subject matter expert, it is well aware of the work, skill, effort, responsibility, and working conditions of the of the employees it represents.

(Resp., ECF No. 64, PageID.3044.) But the Guild Report does not evaluate the duties of each and every reporter at the Free Press to determine whether they perform equal work. (*See* Guild Report, ECF No. 20-2.) Nor does it specifically identify the skills, effort, responsibility, and working conditions of any individual Free Press reporters. (*See id.*) Thus, even if the Court may consider the Guild Report,[12] it does not contain sufficient analysis of the actual duties of Free Press reporters to support a finding that all reporter positions are fungible.

---

[12] Defendants have raised questions concerning the reliability and admissibility of the Guild Report. (*See, e.g.*, Reply at 9–10, 9 n.2, ECF No. 66, PageID.5349–5350.) Defendants may present those arguments in a motion in limine that seeks to preclude admission of the report at trial. The Court expresses no opinion at this time as to whether the report is admissible.

The shortcoming in the reporter-plaintiffs' evidence of fungibility becomes clear when that evidence is contrasted with evidence that the Sixth Circuit found sufficient to establish fungibility in *Beck-Wilson*, *supra* – the case that Plaintiffs cite for the proposition that they can establish a prima facie case by showing that reporters are fungible. (*See* Resp., ECF No. 64, PageID.3042.) In that case, the Sixth Circuit determined that the positions of physician's assistant and nurse practitioner were fungible based upon, among other things, (1) evidence that both positions required the same qualifications *and* (2) "undisputed testimony" that both positions "perform[ed] the same duties." *Beck-Wilson*, 441 F.3d at 362; *see also id.* at 361 (identifying evidence that the two positions involved substantially similar "responsibilit[ies]" and "functions").[13] Moreover, in *Beck-Wilson*, "the undisputed

_____

[13] While the Sixth Circuit in *Beck-Wilson* concluded that the nurse-practitioner and physician assistant positions were fungible, it is not entirely clear whether the court actually held that a plaintiff may make a prima facie case under the EPA by showing that two classes of positions are fungible (and that an employee of the opposite gender in one of the positions is paid more). There are statements in the decision that strongly suggest that the court did so hold. The court said that it "agree[d] with the Court of Federal Claims that evidence that the positions being compared are fungible can support a prima facie case under the EPA. *Allison v. U.S.*, 39 Fed.Cl. 471, 475 (Fed.Cl. 1997)." *Beck-Wilson*, 441 F.3d at 360. And in the *Allison* case cited by the Sixth Circuit, the Court of Federal Claims held that a showing of fungibility (plus pay differences between genders) was sufficient to establish a prima facie case under the EPA. *See Allison*, 39 Fed. Cl. at 475. However, in *Beck-Wilson*, "[e]ach of the plaintiffs . . . identified a specific male [comparator] who she alleges is performing substantially equal work." 441 F.3d at 363. Thus, as Defendants argue (*see* Reply, ECF No. 66, PageID.5343), since each plaintiff did identify a specific comparator who performed substantially the same work, it is at least possible that the court in *Beck-Wilson* did not technically hold that a showing of fungibility (plus

evidence in the record establish[ed] that the defendant consider[ed] the positions to be fungible." *Id.* at 361.  Here, in sharp contrast and as described in detail above, the reporter-plaintiffs have not presented sufficient evidence that all Free Press reporters perform the same duties, and the Free Press' witnesses did not agree that all reporter positions were fungible.  The differences between this case and *Beck-Wilson* underscore that the reporter-plaintiffs have not made a sufficient showing of fungibility to satisfy their prima facie case.

## 2

In contrast to the photographer-plaintiffs, the reporter-plaintiffs did not satisfy their prima facie case by presenting sufficient evidence that a particular male comparator performed substantially the same work under similar conditions and was paid more for that work.  For instance, the reporter-plaintiffs did not identify in the record a complete list of the specific job duties of any male reporter.  Instead, they highlighted references in the record to *some* duties performed by certain male reporters,[14] but this type of evidence is insufficient to support the required finding

_____

pay difference) is sufficient.  For the reasons explained above, however, the Court need not resolve these conflicting readings of *Beck-Wilson*.

[14] For instance, Defendants' response to Plaintiffs' Interrogatory No. 12 identifies certain duties performed by a number of male reporters. (*See* Defs.' Resps. to Pls.' Interrogs., ECF No. 59-2, PageID.813–852.)  But the interrogatory asked Defendants to explain why the male reporters were paid more than the reporter-plaintiffs. (*See id.* at PageID.813.)  It did not ask Defendants to provide a complete list of the male reporters' duties, and the Defendants' answer does not purport to provide such a list. Likewise, some of the Defendants' witnesses referred to certain tasks performed by

that the male reporters' specific duties, as a whole, were substantially the same as the reporter-plaintiffs' specific duties. Because the record does not contain sufficient evidence concerning the specific duties of any male reporter, the reporter-plaintiffs' prima facie case under the EPA fails as a matter of law. *See Carey*, 577 F. App'x at 579–80.

## V

The Court now turns to the claims of all of the plaintiffs under the ELCRA.

## A

"To make out a prima facie case for gender discrimination [under the ELCRA], a plaintiff must show that she was (1) a member of the protected class, (2) subject to an adverse employment action, (3) qualified for the job, and (4) treated differently than similarly situated male employees for the same or similar conduct." *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004). "If the plaintiff establishes a prima facie case of gender discrimination, the burden of production shifts to the defendant to provide a legitimate, non-discriminatory reason for the employment action." *Id.* And, if "the defendant provides a legitimate, non-discriminatory reason," then the burden shifts back to the plaintiff to "produce evidence that the defendant's proffered reason is a pretext for discrimination." *Id.*

---

some male reporters, but this testimony did not purport to be a complete list of the specific duties of any of the male reporters.

**B**

The Defendants are not entitled to summary judgment on the photographer-plaintiffs' claims under the ELCRA. The evidence that was sufficient to satisfy the photographer-plaintiffs' prima facie case under the EPA – described in detail above in Section IV.B.2 – is likewise sufficient to establish their prima facie case under the ELCRA. That evidence shows that the photographer-plaintiffs were females, were subjected to the adverse action of being paid less for the same work,[15] were qualified for their jobs, and were treated differently than similarly situated male employees for the same or similar conduct. *Id.* And the same evidence that precludes summary judgment on the Defendants' affirmative defenses to the photographer-plaintiffs' EPA claim – described in detail above in Section IV.B.4 – is likewise sufficient evidence of pretext to preclude summary judgment on the photographer-plaintiffs' ELCRA claim. Simply put, the Free Press' inability to offer a clear, consistent, and objective explanation for the pay difference between the photographer-plaintiffs and Blanquart is sufficient to support a finding that the Free Press' proffered reason for that difference is a pretext.

---

[15] *See Conti v. Am. Axle & Mfg., Inc.*, 326 F. App'x 900, 911–12 (6th Cir. 2009) (paying a woman a smaller salary than a similarly situated man's qualifies as an adverse action for purposes of the ELCRA).

## C

The Defendants are entitled to summary judgment on the reporter-plaintiffs' claims under the ELCRA.  As described in detail above in Section IV.C.2, those plaintiffs have failed to identify an appropriate comparator, and that failure is fatal to their prima facie case under the ELCRA.

## VI

In the alternative, Defendants argue that they are entitled to summary judgment on all of photographer-plaintiff Galligan's claims under the doctrine of judicial estoppel.  According to Defendants, Galligan's employment-related claims should be barred under that doctrine because she "[f]ailed to disclose them as an asset in a bankruptcy proceeding."[16] (Mot. for Summ. J., ECF No. 59, PageID.794.)

Galligan filed the bankruptcy proceeding in question on November 7, 2014. (*See* Mot. for Summ. J., ECF No. 59, PageID.782; *In re Galligan*, No. 14-57405-tjt (Bankr. E.D. Mich.), Dkt. No. 1.)  Galligan's petition in that proceeding did not disclose her potential pay discrimination claim to the bankruptcy court. (*See id.*)  The bankruptcy court, without mentioning a potential pay discrimination claim, confirmed Galligan's bankruptcy plan on March 25, 2015. (*See In re Galligan*, Dkt.

---

[16] In a footnote, Defendants also contend that Galligan does not have standing in this action because she is a debtor in bankruptcy. (*See* Mot. for Summ. J. at 25 n.6, ECF No. 59, PageID.795.)  Because this issue was neither fully briefed by either party nor raised during oral argument, the Court declines to address it here.

No. 27.) David Pernick, Galligan's bankruptcy attorney, says he first discussed the possibility of a pay discrimination claim against the Free Press with Galligan in "late 2017," and he informed the bankruptcy Trustee about the suit in "May 2018." (Pernick Aff. ¶¶ 5, 8, ECF No. 65-20, PageID.5167.) On January 3, 2019, Galligan filed an amendment with the bankruptcy court that described her employment discrimination claim against the Defendants. (*See In re Galligan*, Dkt. No. 37-1, at 5–6.)

"Judicial estoppel is an equitable doctrine invoked by the court at its discretion." *Newman v. Univ of Dayton*, 751 F. App'x 809, 813 (6th Cir. 2018) (quotation omitted). The doctrine "bars a party from (1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position either as a preliminary matter or as part of a final disposition." *Id.* (quotation omitted). Courts employ judicial estoppel "to preserve the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment." *Id.* (quotation omitted). "[J]udicial estoppel may bar employment-related claims where the plaintiff has failed to disclose as an asset in a bankruptcy proceeding either the existence of such a claim or income derived from the employment relationship at issue." *Id.*

Defendants argue that Galligan should be judicially estopped from going forward in this case because she "(1) assumed a position contrary to the one she asserted under oath in the bankruptcy proceedings; (2) the bankruptcy court adopted the contrary position either as a preliminary matter or as part of a final disposition; and (3) the omission did not result from mistake or inadvertence." (Mot. for Summ. J., ECF No. 59, PageID.794–795.) Defendants note that Galligan did not disclose her pay discrimination claim to the bankruptcy court until after her failure to disclose "was exposed in her deposition in this case and Defendants advised they would move for summary judgment on this basis." (*Id.* at PageID.757.) According to Defendants, Galligan's "tardy" amendment with the bankruptcy court "does not change the result." (*Id.* at PageID.795.)

Plaintiffs, however, presented evidence suggesting that Galligan's nondisclosure was both inadvertent and not so tardy as to prejudice the bankruptcy Trustee. Plaintiffs filed an affidavit from David Pernick, Galligan's bankruptcy attorney, in which he swears that he discussed the possibility of Galligan's pay discrimination lawsuit with Galligan in "late 2017" and that he informed the bankruptcy Trustee about the suit in "May 2018." (Pernick Aff. ¶¶ 5, 8, ECF No. 65-20, PageID.5167.) Pernick also says that neither the Trustee nor any other party to Galligan's bankruptcy has taken any "adverse actions . . . for failure to disclose or provide any required documents." (*Id.* ¶ 14, PageID.5167.) According to Pernick,

Galligan "has complied with all requirements to successfully complete her Bankruptcy Case and receive her Discharge." (*Id.* ¶ 15, PageID.5167.)

Under these circumstances, the Court is not yet prepared to conclude, as a matter of law, that Galligan's claim is barred by judicial estoppel. Rather, Plaintiffs' evidence suggests that Galligan's case is distinguishable from the plaintiff in *Newman*, upon which Defendants rely. In *Newman*, the plaintiff's failure to disclose his discrimination claims to the bankruptcy court was not excused by "mistake or inadvertence" because his filings repeatedly featured "blatant" omissions and false statements. *Newman*, 751 F. App'x at 815. Here, however, Galligan has filed an amendment with the bankruptcy court that reflects her pay discrimination claim against Defendants. (*See In re Galligan*, Dkt. No. 37-1, at 5–6.)

In sum, the Court is persuaded that there is a material factual dispute as to whether Galligan's failure to disclose her pay discrimination claim to the bankruptcy court – since cured – resulted "from mistake or inadvertence." *Newman*, 751 F. App'x at 814. There is likewise a fact question as to whether Galligan was "abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit the exigency of the moment." *Id.* at 813. The Court therefore denies Defendants' motion for summary judgment against Galligan on judicial estoppel grounds.

# VII

After oral argument on Defendants' motion for summary judgment, Defendants filed a motion requesting leave to supplement the record. (*See* Defs.' Mot. to Supp. the Summ. J.R., ECF No. 72.) Defendants filed several documents that purportedly confirm that Blanquart's 21.1% pay increase was for competitive purposes. (*See id.*) But, as noted in Section IV.B.4, even if Blanquart's pay increase was for competitive purposes, it does not fully explain the gap in compensation between him and the photographer-plaintiffs, and Defendants would not be entitled to summary judgment based upon that pay increase even if they proved its existence and purpose. Therefore, there is no need or basis to supplement the record with documents concerning Blanquart's pay raise, and Defendants' motion to do so (ECF No. 72) is **DENIED**.

# VIII

Therefore, for the reasons stated above, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 59) is **GRANTED IN PART** and **DENIED IN PART** as follows:

- Defendants' motion for summary judgment with respect to the claims brought by Galligan and Boone is **DENIED**;

- Defendants' motion for summary judgment with respect to the claims brought by Zaniewski and Mickels is **GRANTED**; and

- Defendants' Motion to Supplement the Record (ECF No. 72) is **DENIED**.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: January 29, 2020

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 29, 2020, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764